UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

CAROLINE WILSON,

                                Plaintiff,

v.                                                          6:14-CV-00122

                                                            (MAD/TWD)

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                                Defendant.
_____

APPEARANCES:                              OF COUNSEL:

CAROLINE WILSON
*Plaintiff Pro Se*

HON. RICHARD S. HARTUNIAN          HEETANO SHAMSOONDAR, ESQ.
United States Attorney for the          Special Assistant United States Attorney
  Northern District of New York
*Counsel for Defendant*
Room 218
James T. Foley U.S. Courthouse
Albany, New York 12207

OFFICE OF GENERAL COUNSEL          STEPHEN P. CONTE, ESQ.
Social Security Administration          Chief Counsel, Region II
26 Federal Plaza, Room 3904
New York, New York 10278

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

## <u>REPORT AND RECOMMENDATION</u>

      This matter was referred to the undersigned for report and recommendation by the

Honorable Mae A. D'Agostino, United States District Judge, pursuant to 28 U.S.C.

§ 636(b) and Northern District of New York Local Rule 72.3.  This case has proceeded in

accordance with General Order 18 of this Court which sets forth the procedures to be followed

when appealing a denial of Social Security benefits.  Both parties have filed briefs.  Oral

argument was not heard.  For the reasons discussed below, it is recommended that the

Commissioner's decision be affirmed.

## I.      BACKGROUND AND PROCEDURAL HISTORY

The Plaintiff was born on June 16, 1982.  (Administrative Transcript at 117, 192.[1])

Plaintiff completed high school and is able to read and write, but has difficulty with numbers and

math.  (T. at 43, 57, 61, 198.)  She tried college but "flunked out" in one semester.  (T. at 45.)

She is able to drive but prefers not to drive more than thirty minutes.  (*See* Dkt. No. 16 at 5[2]; T. at

217.)  She has worked as a cook and cleaner in a pizzeria, as a telemarketer, and as a commercial

cleaner.  (T. at 43, 118.)  Plaintiff alleges disability due to multiple strokes, depression, obesity,

genetic malformation to chromosome 19, auditory processing problems, severe fatigue,

migraines.  (T. at 40, 48-49, 197.)

Plaintiff applied for disability insurance benefits on January 4, 2011, alleging disability as

of July 30, 2002; her last date insured is June 30, 2004.[3]  (T. at 13, 38, 117, 192.)  The

application was initially denied on March 11, 2011.  (T. at 66.)  Plaintiff requested a hearing

---

[1]      The Administrative Transcript is found at Dkt. No. 10.  Citations to the
Administrative Transcript will be referenced as "T" herein.

[2]      Citations to page numbers in the parties' respective briefs refer to the page
numbers assigned by the Court's electronic filing system, not the page numbers in the original
documents.

[3]      Plaintiff had protectively filed for Title II and Title XVI benefits on May 2, 2008.
(T. at 35-39, 192.)  Title XVI benefits were previously approved.  (T. at 13.)  Therefore, the
matter presently before the Court pertains solely to a claim for Title II benefits from July 30,
2002 through June 30, 2004, her last date insured.  (T. at 13, 35-39, 117, 192.)

which was held on September 18, 2012, before Administrative Law Judge ("ALJ") Edward I.

Pitts, who denied the application in a decision dated October 5, 2012. (T. at 13-21, 31-65.) On

December 16, 2013, ALJ Pitts' decision became the final decision of the Commissioner when the

Appeals Council denied Plaintiff's request for review. (T. at 4-9.) Plaintiff was granted an

extension of time to file this action which was commenced on February 4, 2014. (T. at 1-2; Dkt.

No. 1.)

## II.    APPLICABLE LAW

### A.    Standard for Benefits

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI

disability benefits must establish that he or she is "unable to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A) (2006). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such
> severity that he is not only unable to do his previous work but cannot,
> considering his age, education, and work experience, engage in any
> other kind of substantial gainful work which exists in the national
> economy, regardless of whether such work exists in the immediate
> area in which he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for work.

§ 1382c(a)(3)(B).

Acting pursuant to its statutory rulemaking authority (42 U.S.C. § 405(a)), the Social

Security Administration ("S.S.A.") promulgated regulations establishing a five-step sequential

evaluation process to determine disability. 20 C.F.R. § 416.920(a)(4) (2013). Under that five-

step sequential evaluation process, the decision-maker determines:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014.) "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further." *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).

The plaintiff-claimant bears the burden of proof regarding the first four steps. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). If the plaintiff-claimant meets his or her burden of proof, the burden shifts to the defendant-Commissioner at the fifth step to prove that the plaintiff-claimant is capable of working. *Id.* (quoting *Perry*, 77 F.3d at 46).

### B.     Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Featherly v. Astrue*, 793 F. Supp. 2d 627, 630 (W.D.N.Y. 2011) (citations omitted); *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citation omitted). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "An ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." *Roat v. Barnhart*, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010);[4] *see Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion . . . .'" *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted). It must be 'more than a mere scintilla' of evidence scattered throughout the administrative record. *Featherly*, 793 F. Supp. 2d at 630 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258 (citations omitted). However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

---

[4]    On Lexis, this published opinion is separated into two documents. The first is titled *Roat v. Barnhart*, 717 F. Supp. 2d 241, 2010 U.S. Dist. LEXIS 55442 (N.D.N.Y. June 7, 2010). It includes only the district judge's short decision adopting the magistrate judge's report and recommendation. The second is titled *Roat v. Commissioner of Social Security*, 717 F. Supp. 2d 241, 2010 U.S. Dist. LEXIS 55322 (N.D.N.Y. May 17, 2010). It includes only the magistrate judge's report and recommendation. Westlaw includes both the district court judge's decision and the magistrate judge's report and recommendation in one document, titled *Ross v. Barnhart*, 717 F. Supp. 2d 241 (N.D.N.Y. 2010). The Court has used the title listed by Westlaw.

### III.    THE ALJ'S DECISION

The ALJ first determined that Plaintiff did not engage in substantial gainful activity during the period from her alleged disability onset date of July 30, 2002, through the last date insured of June 30, 2004.  (T at 15.)  The ALJ found at step two of the sequential evaluation that during the period in question Plaintiff had the severe impairment of migraine headaches and a severe cognitive impairment.  (T. at 15-16.)  At step three, the ALJ determined that Plaintiff's impairments, singularly or in combination, did not meet or medically equal the criteria of an impairment contained in the Listing of Impairments.  (T. at 16-18.)

The ALJ then concluded that Plaintiff retained the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, except that Plaintiff should not work at heights and should not work around moving machinery.  (T. at 18-20.)  The ALJ also determined that Plaintiff was unable to operate a motor vehicle and she was limited to routine, unskilled work with up to frequent contact with supervisors, coworkers and the general public.  *Id*.  At the fourth step, the ALJ concluded that Plaintiff had no past relevant work.  (T. at 20.)  At the fifth step, ALJ Pitts applied the framework of the Medical-Vocational Guidelines to reach the determination that jobs existed in significant numbers in the national economy that Plaintiff could have performed during the relevant time period.  (T. at 20-21.)  The ALJ then concluded that Plaintiff was not disabled during the relevant time period from July 30, 2002, the alleged onset date, through June 30, 2004, the last date insured, and denied her claim for disability insurance benefits.  (T. at 21.)

### IV.    THE PARTIES' CONTENTIONS

*Pro se* Plaintiff filed a brief listing her medical conditions, but without claiming any

specific errors concerning the ALJ's analysis and determination.  (Dkt. No. 16.)  Plaintiff states she "feel[s] that I deserve the disability benefits [because] I have struggled all my life;" she further notes she needs the disability benefits because she and her husband were "on foreclosure status" and it will relieve stress.  *Id*. at 2, 3, 4.  She also notes she is unable to work because she needs to miss work frequently due to "multiple amounts of pain."  *Id*. at 6.  Defendant contends that the ALJ's decision applied the correct legal standards and is supported by substantial evidence and thus should be affirmed.  (Dkt. No. 19.)

## V.     DISCUSSION

### A.     Step Two Determination

The ALJ found Plaintiff to have severe impairments of migraine headaches and cognitive difficulties at step two of the sequential evaluation process.  (T. at 15-16.)  He did not find the alleged strokes, depression, obesity, abdominal pain, and upper extremity limitations to be severe.  *Id.*  The Commissioner argues that the ALJ's decision indicates that all of Plaintiff's medical conditions were thoroughly reviewed, and that substantial evidence supports the severity determination.  (T. at 11-13.)  Upon review of Plaintiff's testimony, and the administrative record including her medical and school records for the relevant time period of July 30, 2002, through June 30, 2004, I find the Commissioner is correct.

At the second step of the evaluation, the medical severity of a claimant's impairments is considered.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  A "severe impairment" is defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  *Id.* at §§ 404.1520(c), 404.1521, 416.920(c), 416.921.  "Basic work activities" are defined as "the abilities and

aptitudes necessary to do most jobs." *Id.* at §§ 404.1521(b), 416.921(b). These include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out instructions, remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting. *Id.*; *see also Ianni v. Barnhart*, Civ. No. 02-74A, 2005 WL 3220220, *11 (W.D.N.Y. Nov. 18, 2005) and *Camacho v. Apfel*, Civ. No. 97-6151, 1998 WL 813409, at *6 (E.D.N.Y. July 22, 1998). The claimant bears the burden of presenting evidence to establish severity. 20 C.F.R. § 404.1512(c). The claimant must demonstrate "that the impairment has caused functional limitations that precluded him from engaging in any substantial gainful activity for one year or more." *Perez v. Astrue*, 907 F. Supp.2d 266, 272 (N.D.N.Y. 2012) (citing *Rivera v. Harris*, 623 F.2d 212, 215 (2d Cir. 1980)).

A finding of not severe should be made if the medical evidence establishes only a slight abnormality which would have no more than a minimal effect on an individual's ability to work. *Id.* at 271; S.S.R. 85-28, 1985 WL 56858, at * 2 (1985). For the following reasons, I find that the ALJ's decision at step two is supported by substantial evidence and the Plaintiff has not met her burden regarding the alleged severity of her strokes, depression, obesity, abdominal pain, and upper extremity limitations.

### 1.    Migraine Headaches, Cognitive Impairment, Strokes, and Depression

ALJ Pitts noted that the hearing testimony and medical records during the nearly two year period in question clearly show that Plaintiff suffered from migraine headaches and cognitive impairments that caused more than minimal limitations in her ability to perform basic work activities. (T. at 15.) The ALJ also noted that the information in the record concerning strokes

and depression do not show that these conditions caused functional limitations that precluded Plaintiff from performing substantial gainful activity. (T. at 16.)

a.    Cognitive Impairments

On September 29, 1999, the Pocono Mountain School District created a Comprehensive Evaluation Report while Plaintiff was in Grade 12. (T. at 149-71.) Plaintiff's mother reported that Plaintiff did her homework, studied, and tried very hard to achieve her goals. (T. at 150.) Plaintiff got along with other children and adults, was respectful toward authority figures, and her behavior was never a problem. *Id*. Plaintiff's Chemistry teacher reported that she worked independently on tasks and remained focused, assisted others by offering advice, asked questions when necessary, and worked well from initial instructions. *Id*. Plaintiff's English teacher reported that she was doing average work and worked independently and in groups. *Id*. The report indicated that a psychological evaluation performed in October 1994 revealed that Plaintiff had a full scale IQ of 81 and below average cognitive skills. (T. at 150-51.) Achievement testing performed on September 23, 1999, found Plaintiff at a 9th grade equivalent in math, 10th grade equivalent in reading, 5th grade equivalent in spelling, and 8th grade equivalent overall. (T. at 151.) Her rate of acquisition and retention of information was average. *Id*. Plaintiff was placed in general education classes with monitoring support from a special education teacher. (T. at 170.) Plaintiff graduated from high school in 2000 and had a cumulative grade point average (GPA) of 86.574 her senior year. (T. at 173.)

Plaintiff testified she was in special education, always had tutors, and graduated from high school with an independent education plan. (T. at 42-43.) She tried vocational technical training in high school for nursing, but could not understand the blood pressure machine. (T. at

44-45.)  She tried one semester in college and "flunked out."  (T. at 45.)  Plaintiff's mother, Anne

Romanowski, testified that the high school "pushed [Plaintiff] on" and Plaintiff's memory was

damaged from the 1995 stroke such that she was unable to manipulate numbers.  (T. at 57.)

b.      Migraines, Strokes, and Depression

On October 18, 1995, Plaintiff was admitted to the Alfred I. duPont Institute of the

Nemours Foundation Children's Hospital ("duPont Hospital") due to a left cerebrovascular

accident ("CVA") secondary to hemiplegic migraine headaches.  (T. at 308-12.)  She was

discharged on November 3, 1995, with secondary diagnoses of residual right hemiparesis,

expressive-receptive aphasia, post-CVA seizures, and right-sided visual field deficit, and given

instructions to follow-up with the Rehabilitation Clinic.  (T. at 308, 312.)

On November 6, 1995, Plaintiff underwent a speech pathology evaluation at Pocono

Medical Center and was referred to speech and language therapy.  (T. at 611-16.)  Several

months later, on February 29, 1996, Plaintiff was discharged from speech and language therapy

with normal communication functioning at premorbid levels.  (T. at 618-19.)

Plaintiff testified that she had "massive headaches" that "would put me in my bed to

where I couldn't move;" she had blurred vision, and was sensitive to light and sound when the

headaches occurred.  (T. at 48.)  These headaches were "quite frequent" and could last for "a

long time and [the headache] can last for a short period of time."  *Id*.  She took medication for the

headaches.  (T. at 49.)  She had two "very bad" strokes     one when she was a teenager, and one

after gastric bypass surgery which occurred in 2007.  (T. at 47, 680-697.)

Plaintiff's mother testified that during the nearly two year relevant time period, Plaintiff's

major medical problems were hemiplegic migraine headaches, fibromyalgia, and "recovering

from one major stroke at that point and maybe 15 mini-strokes with subsequent hospitalizations prior to that period." (T. at 53-54.) Upon further questioning, Plaintiff's mother confirmed that Plaintiff was living on an Air Force base in Hawaii with her husband and one son during the two year period at issue. (T. at 54.) Plaintiff's mother further confirmed that she did not have a lot of medical contact with Plaintiff during that time until the birth of Plaintiff's son in 2003 when Plaintiff's mother visited Plaintiff in Hawaii for about ten days. (T. at 54-56.)

The medical records during the relevant time period reveal that on November 3, 2000, Plaintiff treated with Dr. James J. Kerrigan at Neurology Associates of Monroe County, P.C. (T. at 633.) Plaintiff reported no headaches since her last visit and she was doing well on Inderal[5], although she was struggling in her college courses and depressed as a result. *Id*. On May 14, 2001, Plaintiff returned to Dr. Kerrigan at which time the physical examination revealed full extraocular movements, symmetrical face, no drift on arm extension, stable gait, and accurate finger to nose testing. (T. at 326.) Dr. Kerrigan assessed a history of complicated migraines and continued the medication Inderal. *Id*. On that same date, a magnetic resonance image ("MRI") of Plaintiff's brain revealed normal findings. (T. at 558.)

On September 10, 2001, Plaintiff saw Dr. Kerrigan with complaints of pain and tingling or numbness when she raised her arms overhead. (T. at 323.) Dr. Kerrigan examined Plaintiff and found good mobility in the neck, little in the way of tenderness to palpation, and otherwise negative findings, including no focal weakness in the upper extremities. The doctor assessed history of complicated migraines stable with Inderal and dysesthesias in the upper extremities

---

[5]    Inderal is a medicine from the beta blocker category used to prevent migraine headaches, and address other conditions. (*See* www.pdrhealth.com/drugs/inderal, last visited March 24, 2015).

with possible brachial plexopathy, although there were no findings to suggest radiculopathy or other entrapment neuropathy.  *Id*.  Dr. Kerrigan stated that he would consider diagnostic imaging, physical therapy, or an electromyography study if Plaintiff's symptoms worsened.  *Id*.  On February 8, 2002, x-rays of Plaintiff's thoracic and lumbar spine were normal.  (T. at  556.)

On July 17, 2002, Plaintiff visited the Shawnee Medical Group, P.C., and reported feeling better.  (T. at 383-84.)  Her complicated migraines and depression were assessed as better and she was prescribed Prozac.  (T. at 384.)  On December 3, 2002, Plaintiff visited Dr. Heidi Goo of the Family Practice Clinic at Tripler Army Medical Center ("Tripler"); she was pregnant and reported carpal tunnel syndrome.  (T. at 517-18.)  Dr. Goo noted that Plaintiff wore wrist braces intermittently, was not taking any medication for carpal tunnel syndrome, and had been off Prozac for months and was doing better.  (T. at 518.)  On June 20, 2003, Plaintiff visited social worker Benny Torres for a family advocacy screening.  (T. at 503-04.)  There was no evidence of a mood or thought disorder.  (T. at 504.)  On January 22, 2004, Plaintiff returned to Dr. Goo and reported no pain, no depressed thoughts, and no loss of interest or pleasure in things.  (T. at 491-92.)  Plaintiff reported no tingling and that the Inderal was working well; her last migraine was months prior during her pregnancy.  (T. at 491.)  Physical examination findings were unremarkable.  (T. at 492.)

On May 17, 2004, Plaintiff underwent an optometry examination with unremarkable findings.  (T. at 527-28.)  On June 16, 2004, Plaintiff underwent an audiogram with unremarkable results.  (T. at 766.)

On October 29, 2004, Plaintiff visited Nurse Susan R. Grass at Tripler.  (T. at 481-86.)  Plaintiff had recently given birth to a second boy in September 2004 and reported no periods of

depression.  (T. at 482-83.)  On February 3, 2005, Plaintiff visited Dr. Aixa D. Espinosa, for a neurologic consultation.  (T. at 468-70.)  Plaintiff reported headaches occurring at least twice a week, alleviated by sleeping, Tylenol, or Motrin with good results.  (T. at 468.)  Dr. Espinosa reported that Plaintiff underwent extensive work up at duPont Hospital, including a high resolution chromosome mapping, which was within normal limits.  (T. at 468-69.)  Neurological examination revealed unremarkable findings, including that she was alert, active, and oriented with no aphasia or dysarthria.  (T. at 469.)  She had full (5/5) motor strength in the upper and lower extremities, symmetrical 2+ deep tendon reflexes, and normal coordination.  Dr. Espinosa assessed that Plaintiff was fully recovered from the stroke with unremarkable neurological findings.  (T. at 469.)

On October 31, 2005, an MRI of Plaintiff's brain revealed no acute intracranial pathology. (T. at 526.)  In January 2008, Plaintiff underwent DNA sequencing with abnormal findings.  (T. at 922-30.)  Dr. Behzad Maghsoudlou reviewed the results and found that it precluded clear interpretation because the variant found in Plaintiff's DNA is found in both disease-associated mutations and benign polymorphism.  (T. at 709-10.)

On March 9, 2011, State agency psychiatrist Dr. H. Tzetzo reviewed the evidence of record and determined that there was insufficient evidence to substantiate the presence of an organic mental disorder or affective disorder during the relevant period, from July 30, 2002, through June 30, 2004.  (T. at 743-56.)  Based upon his assessment of the medical records and other evidence of record, he opined that there was insufficient evidence of Plaintiff's mental condition meeting the criteria for Listing Impairments 12.02 and 12.04.  *Id*.; *see* 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1").

Notably, Plaintiff gave birth to and cared for two young children during the two year period at issue. (T. at 46-47, 54-55.)

c.      Step Two Findings

Based upon the above outline of pertinent evidence in the administrative record, it is clear that Plaintiff had a history of migraine headaches and received treatment and medication for that condition. Plaintiff also showed some difficulty in high school which completed in 2000, about two years prior to the period in question. (T. at 173.) The 1994 IQ evaluation showed a verbal IQ of 90, a performance IQ of 75, and a full scale IQ of 81. (T. at 151.) She had difficulty in math and abstract reasoning. (T. at 180.) Thus, I find the record contains substantial evidence to support the ALJ's finding of severity with regard to Plaintiff's migraine headaches and cognitive functioning which cause more than minimal limitations on Plaintiff's ability to perform basic work activities.

However, Plaintiff failed to carry her burden at step two to provide evidence showing that her alleged strokes and depression were severe or caused functional limitations that precluded her from performing substantial gainful activity. Moreover, the ALJ's failure to find these two conditions severe is well-supported by the record. Regarding Plaintiff's mental impairment, the ALJ properly reviewed the listing criteria for listings under Appendix 1, Listing Impairments 12.02 and 12.04 "paragraph B" and "paragraph C" and found Plaintiff's mental conditions did not meet or equal the listing criteria. (T. at 16-19.)

Plaintiff had minimal treatment for depression and strokes during the relevant two year period; and the treatment showed she was stable with unremarkable physical exams. (T. at 323, 326, 383-84, 491-92, 503-04, 517-18, 556, 558, 633.) There is nothing in the objective medical

records to show these conditions prevented her from performing basic work activities. Plaintiff may not prove her impairment was severe without pointing to medical signs and objective medical test findings establishing the existence of an underlying condition reasonably expected to produce the symptomatology alleged. 20 C.F.R. § 404.1529(b); S.S.R. 96-7p, 1996 WL 374186, at *2, (S.S.A. July 2, 1996).

2.      Obesity, Abdominal Pain, and Upper Extremity Limitations

The ALJ found that Plaintiff's alleged obesity, abdominal pain, and upper extremity limitations were not severe. (T. at 16.) The medical records outlined above show that Plaintiff had little or no treatment for these conditions from 2002 to 2004. There is no evidence that these conditions were affecting her ability to perform basic work activities and, as such, were properly found not severe by ALJ Pitts. *Id.*

Regarding obesity, "those circuits which have recently commented on this complaint have held that an ALJ's failure to explicitly address a claimant's obesity does not warrant remand . . . . When an ALJ's decision adopts the physical limitations suggested by reviewing doctors after examining the Plaintiff, the claimant's obesity is understood to have been factored into their decisions." *Guadalupe v. Barnhart*, 2005 WL 2033380, at *6 (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552-53 (3d Cir. 2005) & *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)); *see also Stemple v. Astrue*, 2007 WL 601566, at *10 (D. Md. Feb. 26, 2007) (noting that "some courts have found harmless error in certain cases where the ALJ fails to discuss a claimant's obesity") (citations omitted).

Here, the ALJ considered Plaintiff's obesity, noting that the issue of obesity, among others, appears several years after the time in question. (T. at 16.) Plaintiff's treatment for

obesity, in the form of gastric bypass surgery, occurred in 2007.  (T. at 681, 683.)  Neither

Plaintiff nor any medical professional points to any functional limitations caused by Plaintiff's

obesity.  Accordingly, consistent with the Commissioner's policy, S.S.R. 02-1p, 2000 WL

628049, at * 4 (S.S.A. Sept. 12, 2002), the ALJ did not make assumptions about the severity or

functional effects of Plaintiff's obesity.  Rather, the ALJ relied on the records which showed no

functional limitations related to Plaintiff's claimed obesity, abdominal pain, and upper extremity

problems.  (T. at 16.)

Plaintiff had the burden of presenting evidence which shows that an impairment is severe.

*Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999).  Plaintiff failed to carry this burden that the

conditions of strokes, depression, obesity, abdominal pain, and upper extremity problems were

severe either on their own or in combination with her other medical conditions.  The medical

evidence in the record showed that these conditions, singularly or in combination with other

impairments, did not limit her ability to do basic work activities during the two year period in

question.  These conditions did not require extensive medical treatment and Plaintiff did not take

medications to address any of them.  While Plaintiff reported abdominal pain and upper

extremity pain, these reports occurred after the time at issue.  (*See, e.g.,* T. at 770-772.)

Additionally,  "disability requires more than mere inability to work without pain.  To be

disabling, pain must be so severe, by itself or in conjunction with other impairments, as to

preclude any substantial gainful employment."  *Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d

Cir. 1983).

Accordingly, the Court agrees with the Defendant that the ALJ correctly found that

Plaintiff's migraine headaches and cognitive impairments to be severe, and all other conditions

were properly found not severe impairments, singularly or in combination with each other or other impairments, as they did not significantly limit her physical or mental capacity to perform basic work functions.

### B.     Residual Functional Capacity Determination

The ALJ found that Plaintiff retained the RFC to perform a full range of work at all exertional levels, except that Plaintiff should not work at heights and should not work around moving machinery.  (T. at 18-20.)  The ALJ also determined that Plaintiff was unable to operate a motor vehicle and she was limited to routine, unskilled work with up to frequent contact with supervisors, coworkers and the general public.  *Id*.

#### 1.     Residual Functional Capacity Generally

A claimant's RFC is the most the individual can do despite his or her limitations.  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis.  A regular and continuing basis means eight hours a day, for five days a week, or an equivalent work schedule.  *Pardee v. Astrue*, 631 F. Supp. 2d 200, 210 (N.D.N.Y. 2009) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quotations omitted)).

It is the ALJ's job to determine a claimant's RFC, and not to simply agree with a physician's opinion.  20 C.F.R. 404.1546(c).  In determining RFC, the ALJ can consider a variety of factors including a treating physician's or examining physician's observations of limitations, the claimant's subjective allegations of pain, physical and mental abilities, as well as the limiting effects of all impairments even those not deemed severe.  *Id.* at § 404.1545(a).  Age, education,

past work experience, and transferability of skills are vocational factors to be considered. *Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999). Physical abilities are determined by evaluation of exertional and nonexertional limitations. Exertional limitations include claimant's ability to walk, stand, lift, carry, push, pull, reach, and handle. 20 C.F.R. §§ 404.1569a(a), 404.1569a(b), and 416.969a(a). Nonexertional limitations include mental impairments and difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching. *Id.*

"The RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations." *Whittaker v. Comm'r of Soc. Sec.*, 307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004) (citation omitted). In assessing RFC, the ALJ's findings must specify the functions a plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient. *Roat,* 717 F. Supp. 2d at 267 (citation omitted). RFC is then used to determine the particular types of work a claimant may be able to perform. *Whittaker*, 717 F. Supp. 2d at 440.

Based on the entire record, the ALJ reasonably concluded that during the relevant period Plaintiff retained the RFC to perform a full range of work at all exertional levels, except she was unable to work at heights or around moving machinery, and could not operate a motor vehicle. (T. at 18.) The ALJ also limited Plaintiff to routine, unskilled work with only up to frequent contact with supervisors, coworkers, and the general public. (T. at 18.) Plaintiff bears the burden of identifying medical evidence to show she had limitations in her RFC. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) ("The Commissioner need only show that there is work in the national economy that the claimant can do; he need not provide additional evidence of the

claimant's residual functional capacity.").

In reaching his RFC finding, the ALJ considered the treatment notes from Dr. Kerrigan, which repeatedly found Plaintiff doing well on Inderal, with unremarkable examination findings, including full extraocular movements, symmetrical face, no drift on arm extension, stable gait, and accurate finger to nose testing. (T. at 18, 323, 326, 663.) The ALJ also considered Plaintiff's school records, which showed that she was doing average work, could work independently and in groups, had average rate of retention and acquisition, and graduated from high school with a cumulative GPA of 86.574 her senior year while in general education classes. (T. at 150-51, 170, 173.) Diagnostic evidence also supports the ALJ's RFC finding. For example, x-rays of Plaintiff's lumbar and thoracic spine were normal, an MRI of her brain also revealed normal findings, and an optometry exam and ideogram were also generally unremarkable. (T. at 527-28, 556, 558, 766.) The ALJ also noted the sporadic treatment notes during the relevant period and that Plaintiff's condition worsened after her recent hospitalization in December 2007, well after her date last insured. (T. at 16.) "The [Commissioner] is entitled to rely not only on what the record says, but also on what it does not say." *Dumas*, 712 F.2d at 1553. Moreover, evidence of an impairment which reached disabling severity after the relevant adjudicated period, or which was exacerbated thereafter, cannot be the basis for the determination of entitlement to benefits, even though the impairment itself may have existed during the relevant period. *Arnone v. Bowen*, 882 F.2d 34, 37-38 (2d Cir. 1989).

2.     Credibility and the RFC

In addition to reviewing the medical evidence in determining the RFC, the ALJ must review the credibility of Plaintiff. The Court reviews an ALJ's findings of fact under a

substantial evidence standard. "It is the function of the Commissioner, not the reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y, Dept. of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (citation and internal punctuation omitted). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record. 20 C.F.R. § 404.1529; *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010); *see* SSR 96-7p, 1996 WL 374186, at *5 (S.S.A. July 2, 1996). The ALJ is required to consider all of the evidence of record in making the credibility assessment. *Genier,* 606 F.3d at 50 (citing 20 C.F.R. §§ 404.1529, 404.1545(a)(3)).

First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the claimant's pain or other symptoms." SSR 96-7p, 1996 WL 374186, at *2. This finding "does not involve a determination as to the intensity, persistence, or functionally limiting effects of the claimant's pain or other symptoms." *Id.* If no impairment is found that could reasonably be expected to produce pain, the claimant's pain cannot be found to affect the claimant's ability to do basic work activities. *Id.* An individual's statements about his pain are not enough by themselves to establish the existence of a physical or mental impairment, or to establish that the individual is disabled. *Id.* Here, the ALJ determined that Plaintiff's medically determined impairment could reasonably be expected to cause the symptoms alleged by Plaintiff. (T. at 19.)

Once an underlying physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms has been established, the second step of the analysis is for the ALJ to "'consider the extent to which [the claimant's] symptoms can

reasonably be accepted as consistent with other objective medical evidence and other evidence.'" *Genier,* 606 F.3d at 49 (quoting 20 C.F.R. § 404.1529(a)); *see also Poupore,* 566 F.3d at 307 (2d Cir. 2009) (finding that claimant's subjective complaints of pain were insufficient to establish disability because they were unsupported by objective medical evidence tending to support a conclusion that he had a medically determinable impairment that could reasonably be expected to produce the alleged symptoms); *see also* SSR 96-7p, 1996 WL 374186, at *2 ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record."). This includes evaluation of the intensity, persistence, and limiting effects of the pain or symptoms to determine the extent to which they limit the claimant's ability to perform basic work activities. SSR 96-7p, 1996 WL 374186, at *2.

The ALJ must consider all evidence of record, including statements the claimant or others make about his or her impairments, restrictions, daily activities, efforts to work, or any other relevant statements the claimant makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony during administrative proceedings. *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1512(b)(3)). A claimant's "symptoms can sometimes suggest a greater level of severity than can be shown by the objective medical evidence alone." SSR 96-7p, 1996 WL 374186, at *3. However, when the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3)

precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.  20 C.F.R. §§ 404.1529(c)(3)(I)-(vii); 416.929(c)(3)(I)-(vii).

The ALJ considered Plaintiff's alleged symptoms and functional limitations and found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not fully credible.  (T. at 18-20.)  The totality of the medical evidence discussed above did not corroborate Plaintiff's subjective symptomatology to the disabling extent alleged, including the diagnostic evidence and the sparse treatment notes.  *See* 20 C.F.R. 404.1529(c)(2) (objective medical evidence as a factor in evaluating symptoms).  Furthermore, Plaintiff was doing well although she discontinued her Prozac, wore wrist braces intermittently, was not taking any medication for her alleged carpal tunnel syndrome, and was doing well and stable on Inderal. (T. at 384, 518.)  Treatment notes from Dr. Goo and Dr. Kerrigan also show that Plaintiff would go several months without headaches.  (T. at 492, 633.)

In making the credibility determination here, the ALJ reviewed Plaintiff's activities of daily living, the exam findings of the medical professionals, her school activities, the medications she took and their effectiveness, and the treatment Plaintiff received.  (T. at 18-20.)  Plaintiff had her first child in 2003 and her second child in 2004, and testified that she took care of the children by herself.  (T. at 18, 50.)  Plaintiff argues that she is unable to perform her daily activities such as cooking, washing dishes, and caring for her children, and that she cannot follow instructions, focus, finish tasks, perform basic math, or be around people due to her limitations.

(Dkt. No. 16 at 7-8.)  However, Plaintiff's claims in this regard relate to her current abilities and limitations and do not relate to the period at issue, from July 30, 2002, through June 30, 2004. *Id.*  Plaintiff indicated in 2011, that she could get her kids dressed and off to school, pick up the kids, fix easy simple meals, do laundry, shop for groceries, and drive a car.  (T. at 215-218.) Plaintiff also argues that her house was in foreclosure, and she cannot repay her SSI overpayment or afford her medication without disability benefits.  *Id.* at 8, 10.  While these concerns are compelling, they do not establish that Plaintiff was disabled prior to her date last insured as required for disability insurance benefits.  Here, as shown above, the ALJ properly determined Plaintiff's RFC by examining the medical and educational evidence and the statements of Plaintiff and her mother regarding her claimed impairments.

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'"  *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, 96 Civ. 9435 (JSR)(SEG), 1999 WL 185253, at *5, 1999 U.S. Dist. LEXIS 4085, at *15-16 (S.D.N.Y. Mar. 25, 1999) (citations omitted)).  "A finding that [a claimant] is not credible must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record."  *Williams ex rel Williams*, 859 F.2d at 260-61 (citation omitted) (finding that failure to make credibility findings regarding claimant's critical testimony "undermines the Secretary's argument that there is substantial evidence adequate to support his conclusion that claimant is not" disabled).  "Further, whatever findings the ALJ makes must be consistent with the medical and other evidence."  *Id.* at 261 (citation omitted) ("[A]n ALJ must

assess subjective evidence in light of objective medical facts and diagnoses.").

Here, the ALJ did not erroneously diminish Plaintiff's credibility. The ALJ clearly considered the symptom-related factors and found Plaintiff's statements about her symptoms were inconsistent with the medical and other evidence during the relevant time period. (T. at 19-20.) Based upon the above, I find that the ALJ properly set forth his reasons for finding Plaintiff's claims inconsistent with regard to the intensity, persistence, and limiting effects of her symptoms. Therefore, I find no error in ALJ Pitts' RFC determination because it is based upon proper legal principles and supported by substantial evidence.

### C.  Step Five Determination

The ALJ's step five determination was based upon an application of the Medical-Vocational Guidelines (the "grids"). (T. at 20-21.) I find no fault with the ALJ's determination at step five.

Generally, the Commissioner meets her burden at the fifth step by resorting to the applicable grids. *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2 (1986)). The grids take into account the claimant's residual functional capacity in conjunction with the claimant's age, education, and work experience. *Id.* "Based on these considerations the grids indicate whether the claimant can engage in any substantial gainful work existing in the national economy." *Id.*

Where a claimant is able to demonstrate that his or her impairments prevent a return to past relevant work, the burden then shifts to the Commissioner at step five to prove that a job exists in the national economy which the claimant is capable of performing. *See Curry v. Apfel*, 209 F.3d 117, 122 (2d Cir. 2000); 20 C.F.R. §§ 404.1560(c), 416.960(c). Work exists in the

national economy when it exists in significant numbers either in the region where the claimant lives or in several other regions in the country. 20 C.F.R. §§ 404.1566(a), 416.966(a). In making this determination, the ALJ may apply the grids or consult a vocational expert. *See Rosa*, 168 F.3d at 78; 20 C.F.R. pt. 404, subpt. P, App. 2 (the grids provide a "framework for consideration of how much the individual's work capacity is further diminished in terms of any types of jobs that would be contraindicated by . . . nonexertional limitations."). If the claimant's characteristics match the criteria of a particular grid rule, the rule directs a conclusion as to whether he or she is disabled. *Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996).

However, if a claimant suffers from nonexertional impairments that "significantly limit the range of work permitted by exertional limitations," the ALJ should elicit testimony from a vocational expert to determine if jobs exist in the economy that the claimant can still perform. *Id.* at 39 (quoting *Bapp v. Bowen*, 802 F.2d 601, 605-06 (2d Cir. 1986)); 20 C.F.R. §§ 404.1566(e), 416.966(e); *see also Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (citing *Bapp*, 802 F.2d at 605). The vocational expert may testify as to the existence of jobs in the national economy, and as to the claimant's ability to perform any of those jobs, given his functional limitations. *See Colon v. Comm'r of Soc. Sec.*, No. 6:00-CV-0556 (GLS), 2004 WL 1144059, at *6, 2004 U.S. Dist LEXIS 5125, at * 18 (N.D.N.Y. Mar. 22, 2004). A nonexertional limitation is one imposed by the claimant's impairments that affect his ability to meet the requirements of jobs other than strength demands, and includes manipulative impairments such as pain. *Rosa*, 168 F.3d at 78 n.2 (citing *Soblewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997); 20 C.F.R. § 404.1569a(c)). Where the nonexertional impairment has more than a negligible impact on a claimant's ability to perform the full range of work, the testimony of a

vocational expert must be obtained. *Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir. 2013) (citing *Zabala*, 595 F.3d at 411). An impairment is not negligible when it so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity. *Id.* (finding that the ALJ erred by not determining whether claimant's reaching limitation was negligible or precluded reliance on the grids). Nonetheless, the existence of nonexertional limitations does not automatically preclude reliance on the Medical-Vocational Guidelines, or require that the ALJ consult a vocational expert. *Zabala*, 595 F.3d at 411. Where the claimant's nonexertional limitations do not result in an additional loss of work capacity, an ALJ's use of the grids is permissible. *Id.*

The ALJ's reliance on the grids here was not in error. The Plaintiff was found to have an RFC to perform work at all exertional levels. (T. at 18.) While Plaintiff alleged pain, the ALJ declined to find Plaintiff's complaints of pain credible. (T. at 19.) Therefore, there is no error in the ALJ's determination that pain did not deprive Plaintiff of a meaningful employment opportunity. *Selian*, 708 F.3d at 421-22 (no error in ALJ's conclusion that pain did not deprive plaintiff of a meaningful employment opportunity where ALJ declined to find plaintiff's testimony about pain credible). As noted, the ALJ determined Plaintiff had the RFC "to perform a full range of work at all exertional levels" and considered her complaints by finding that Plaintiff was unable to work at heights or around moving machinery, or drive a car." (T. at 18.) Notably, Plaintiff does not specifically challenge the RFC finding.

The Court finds substantial evidence supports the ALJ's finding that the Plaintiff's nonexertional limitations do not significantly erode the occupational base. (T. at 21.) The ALJ took into account Plaintiff's nonexertional limitations by restricting her from working near

heights and moving machinery, as well as restricting her from operating a motor vehicle. (T. at 18.) Citing S.S.R. 85-15, 1985 WL 56857 (S.S.A. 1985), the ALJ indicated that a person with those restrictions "does not preclude any of the basic mental demands of competitive, remunerative, unskilled work." (T. at 21.) Thus, ALJ Pitts properly conducted an erosion-of-the-occupational-base analysis and found, based upon substantial evidence of record, that Plaintiff's nonexertional limitations were not significant because he found the Plaintiff's limitations matched the parameters of the grids. (T. at 20-21; S.S.R. 85-15, 1985 WL 56857, at * 3.)

Therefore, substantial evidence supports the ALJ's finding that Plaintiff's nonexertional impairments did not significantly reduce her occupational base, and the ALJ's reliance on the grids to provide the framework for determining that Plaintiff's nonexertional impairments were not disabling was correct. Under these circumstances, testimony of a vocational expert or other similar evidence regarding the existence of jobs Plaintiff can perform in the economy is unnecessary. The ALJ also correctly considered the Plaintiff's age, education, work experience, and the RFC, and concluded that jobs exist in significant numbers in the national economy that Plaintiff can perform. (T. at 20-21.) As such, the ALJ's decision was based upon correct legal standards and substantial evidence supports the determination that Plaintiff was not under a disability within the meaning of the Social Security Act. 20 C.F.R. § 416.920(g).

**WHEREFORE,** it is hereby

**RECOMMENDED**, that the Commissioner's decision be affirmed and Defendant's motion for judgment on the pleadings be **GRANTED** and the complaint (Dkt. No. 1) be **DISMISSED.**

27

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health & Human Servs*., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: March 25, 2015
   Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge